**Nos. 26-1396, 26-1493**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

**NEW ENGLAND SYNOD, Evangelical Lutheran Church in America; GREATER MILWAUKEE SYNOD, Evangelical Lutheran Church in America; SOUTHWEST CALIFORNIA SYNOD, Evangelical Lutheran Church in America; SOUTHWESTERN TEXAS SYNOD, Evangelical Lutheran Church in America; SIERRA PACIFIC SYNOD, Evangelical Lutheran Church in America; SAN FRANCISCO FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; NORTH PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; AMERICAN BAPTIST CHURCHES USA; ALLIANCE OF BAPTISTS; METROPOLITAN COMMUNITY CHURCHES,**

**Plaintiffs - Appellees/Cross-Appellants,**

**v.**

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary,**

**Defendants - Appellants/Cross-Appellees.**

---

**On Appeal from the United States District Court for the District of Massachusetts**

---

# BRIEF OF *AMICUS CURIAE* FEDERATION FOR AMERICAN IMMIGRATION REFORM IN SUPPORT OF DEFENDANTS-APPELLANTS

---

Matt A. Crapo
Christopher J. Hajec
Edwin E. Pieters
Federation for American Immigration Reform
25 Massachusetts Ave NW, Suite 335
Washington, DC 20001
(202) 328-7004
mcrapo@fairus.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Federation for American Immigration Reform makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

DATED: August 3, 2026 Respectfully submitted,

/s/ Matt A. Crapo

## TABLE OF CONTENTS

**<u>Page</u>**


DISCLOSURE STATEMENT ........ i

TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICUS CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 2

I. Plaintiffs lack standing ........ 2

II. The district court erred in concluding that the 2025 memoranda substantially burden Plaintiffs' religious rights ........ 8

CONCLUSION ........ 10

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**<u>Page(s)</u>**

### CASES


*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................6

*Lujan v. Def. of Wildlife*,
504 U.S. 555 (1992) ..................................................................................2, 10

*Murthy v. Missouri*,
603 U.S. 43 (2024) ..........................................................................................3

*Mennonite Church USA v. United States Dep't of Homeland Sec.*,
778 F. Supp. 3d 1 (D.D.C. 2025) ....................................................................7

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .........................................................................................2, 3


### STATUTES


42 U.S.C. § 2000bb-1 .......................................................................................9

Religious Freedom Restoration Act,
Pub. L. 103-141, 107 Stat. 1488 (1993) ..........................................................8

Secure Fence Act of 2006,
Pub. L. 109-367, 120 Stat. 2638 .......................................................................9

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Federation for American Immigration Reform ("FAIR") is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to advocate for immigration policy that is in America's best interest. FAIR has been involved in more than 100 legal cases since 1980, either as a party or *amicus curiae*, with the aim of advancing this mission.[1]

The decision on review, which enjoined an administrative policy regarding immigration law enforcement in sensitive locations such as churches, hinders federal agents' ability to apprehend and deport illegal immigrants effectively and efficiently. *Amicus* FAIR thus has a direct and vital interest in the outcome of this case.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's grant of a preliminary injunction. Because Plaintiffs failed to support their claims that, due to a change in agency guidance, their congregations have contracted in size, to the detriment of

---

[1] All parties have consented to the filing of this *amicus* brief. No counsel for any party authored this brief in whole or in part and no person or entity, other than *amicus curiae*, its members, or its counsel, has contributed money that was intended to fund preparing or submitting the brief.

both their revenue and their religious rights, they failed to establish either standing or imminent, irreparable harm.

Accompanied by massive publicity and coverage in the media, the Trump administration has promised mass deportations and has greatly intensified efforts to remove illegal aliens. In light of these efforts, the district court improperly determined that Plaintiffs showed a causal relationship between their claimed injuries and the alleged change in agency policy over "protected spaces" such as churches. Fatally both to Plaintiffs' standing and to their religious liberty claim, Plaintiffs failed to show that their claimed injuries were even caused by the memoranda relating to protected spaces specifically, rather than by this general, highly-publicized ramping-up of enforcement.

## ARGUMENT

### I. Plaintiffs lack standing.

To obtain a preliminary injunction, Plaintiffs "must establish," among other things, that they are likely to succeed on the merits. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). Establishing standing is a prerequisite to demonstrating a likelihood of success. To establish standing, Plaintiffs must show (1) that they have suffered or will imminently suffer an injury-in-fact, (2) that the alleged injury is "fairly traceable" to the challenged conduct of Defendants, and (3) that it is "likely" that the injury will be redressed by a favorable decision. *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "At the preliminary injunction stage," Plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22).

Plaintiffs allege that they are injured by two memoranda that changed internal guidance regarding immigration enforcement at sensitive or protected areas, which include houses of worship. On January 20, 2025, Acting Secretary of Homeland Security Benjamin Huffman issued a memorandum entitled "Enforcement Actions in or Near Protected Areas." Addendum to Defendants-Appellants Brief ("ADD.") at 70. The Huffman memorandum rescinded a similar one issued in 2021 by former Secretary Mayorkas, which provided guidance for immigration enforcement in "protected areas," including churches, healthcare facilities, schools, playgrounds, and graveyards. *See* JA 104-08 (Mayorkas Memorandum). Shortly thereafter, on January 31, 2025, the Acting Director of U.S. Immigration and Customs Enforcement ("ICE") issued another memorandum making senior agents responsible "for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." ADD. 73. Thus, these two 2025 memoranda (collectively "the 2025 memoranda") rescinded the guidance established in the Mayorkas memorandum and made certain senior agents—instead of agency

headquarters (*see* JA 107)—responsible for exercising discretion and common sense in determining whether, where, and when to conduct an immigration enforcement action in or near a protected area.

In contrast to the relatively little-publicized 2025 memoranda, the incoming Trump Administration had made well-publicized promises to enforce the nation's immigration laws vigorously. For instance, in August of 2024, Karoline Leavitt, then Donald Trump's campaign spokesperson, stated that "Trump will restore his effective immigration policies, implement brand new crackdowns that will send shockwaves to all the world's criminal smugglers, and marshal every federal and state power necessary to institute the largest deportation operation of illegal criminals… in American history."[2] Shortly after Trump's election, the media expressed concerns about the potential for the incoming administration to "kick off the detention and deportation of migrants at large scale."[3] Then, upon taking

---

[2] Kinsey Crowley, *Agenda47: Why Trump's immigration-reform proposals come with legal, feasibility concerns*, USA Today, Aug. 19, 2024, https://www.usatoday.com/story/news/politics/elections/2024/08/19/agenda47-20-promises-donald-trump-immigration-policies/74741280007/.

[3] Priscilla Alverez and Phil Mattingly, *Mass detention and returning migrants to Mexico: Donald Trump's plans on immigration are coming into focus*, CNN, Nov. 16, 2024, https://www.cnn.com/2024/11/16/politics/donald-trump-immigration-plans/.

office, President Trump signed several immigration-related executive orders authorizing, among other things, the immediate removal of illegal aliens.[4]

To be sure, the rescission of former Secretary Mayorkas's protected-areas policy and its replacement with the subsequent policy did garner some media coverage,[5] but nowhere near the avalanche of coverage heralding Trump's broader immigration and deportation policies. Plaintiffs nevertheless attempted to trace their purported injuries to the 2025 memoranda instead of the broader policies publicized in a flood of articles, op-eds, and news reports that had started before and continued well after the issuance of the 2025 memoranda.

Here, Plaintiffs alleged, and the district court erroneously agreed, that the Plaintiffs had standing based on their congregants' fear of immigration

---

[4] *See, e.g.,* The White House, *Fact Sheet: President Donald J. Trump Protects the States and the American People by Closing the Border to Illegals via Proclamation*, January 22, 2025, https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-protects-the-states-and-the-american-people-by-closing-the-border-to-illegals-via-proclamation/.

[5] *See, e.g.,* Ximena Bustillo, Sergio Martinez-Beltran, *Trump administration strips schools, churches of immigration enforcement protections*, NPR, January 21, 2025, https://www.npr.org/2025/01/21/nx-s1-5269899/trump-immigration-enforcement-schools-churches; Camilo Montoya-Galvez, *Trump officials revoke Biden policy that barred ICE arrests near "sensitive locations" like schools and churches*, CBS NEWS, January 21, 2025, https://www.cbsnews.com/news/trump-immigration-ice-arrests-sensitive-locations/; Adam Shaw, Bill Melugin, *Trump DHS repeals key Mayorkas memo limiting ICE agents, orders parole review*, FOX NEWS, January 21, 2025, https://www.foxnews.com/politics/trump-dhs-repeals-key-mayorkas-memo-limiting-ice-agents-orders-review-parole-use?msockid=230397c9804965ad23f781a6814e644e.

enforcement at places of worship, which caused a decrease in attendance at social ministries and a decrease in donations due to the drop in attendance. According to the district court, this fear and resulting decrease in attendance was at least partly due to the 2025 memoranda. ADD. 22. But subjective fear alone is not a basis for standing, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417 & n.7 (2013), and that is the most Plaintiffs had shown with respect to the 2025 memoranda. Far from permitting ICE to conduct immigration raids at houses of worship that were not permitted before, the 2025 memoranda merely shifted responsibility for approving enforcement actions at protected areas from agency headquarters to certain senior agents in the field. Compare JA 107 and ADD. 73. And the 2025 memoranda have not, in fact, resulted in any actual enforcement actions at Plaintiffs' houses of worship. ADD. 19 ("[P]laintiffs provide no evidence that an enforcement action at any one of their places of worship is 'certainly impending,' or even that there is a 'substantial risk' that one will occur.").

Indeed, fatally to both traceability and redressability, there is no reason to believe that religious attendance would rebound under a return to the prior guidance. As the court in *Mennonite Church USA v. United States Dep't of Homeland Sec.*, observed:

> Reverting to the Mayorkas Memorandum would not mitigate the risks cited by congregants of leaving their homes generally, or of traveling to or from religious services. On its face, the Mayorkas Memorandum creates no legally enforceable rights and confers only limited

> protections against immigration officers' exercise of discretion. *See* [JA 106-07]. For example, it provides "no bright-line definition of what constitutes 'near'" a place of worship and directs officers to use the "exercise of judgment," thus allowing officers to take enforcement actions within blocks of churches or synagogues. *Id.* It further provides that immigration officers may enter places of worship with "prior approval from their Agency's headquarters" or from a supervisor the agency may "otherwise delegate." [JA 107]. That prior written approval requirement has changed only minimally under the Vitello guidance, which directs officers to seek prior verbal or written approval from Assistant Field Office Directors and Assistant Special Agents in Charge. *See* [ADD. 73]. Further, it is questionable that any substantive distinctions between the memoranda deter the kinds of immigration enforcement actions that the plaintiffs seek to prevent.

778 F. Supp. 3d 1, 12 (D.D.C. 2025).

In short, if illegal aliens will face real risks from, and have well-grounded fears of, attending Plaintiffs' religious services or activities, as necessary for Plaintiffs to have an injury sufficient for standing, it is because the Trump administration's general, highly-publicized ramping-up of immigration law enforcement creates for them a general risk and well-grounded fear of going out in public unnecessarily, whether to church, shopping malls, or other public areas, not because of relatively obscure agency memoranda about enforcement in a wide range of "protected areas" that Plaintiffs failed to show even increases the likelihood of enforcement actions at religious services. The district court accordingly erred in determining that Plaintiffs had sufficiently established standing.

**II. The district court erred in concluding that the 2025 memoranda substantially burden Plaintiffs' religious rights.**

For similar reasons, the district court also erred in concluding that the 2025 memoranda substantially burden Plaintiffs' religious rights under the Religious Freedom Restoration Act ("RFRA"), Pub. L. 103-141, 107 Stat. 1488 (1993), codified at 42 U.S.C. § 2000bb *et seq*. If Plaintiffs' alleged injuries to their religious activity cannot even be causally traced to the 2025 memoranda, neither can those memoranda have substantially burdened Plaintiffs' religious rights.

The district court suggested that the 2025 memoranda would "permit immigration-enforcement officers to set up a checkpoint just outside a church, or to question parishioners in the middle of a Catholic Mass." ADD. 43. Of course, the 2025 memoranda do no such thing; as the government points out in its brief, the 2025 memoranda simply modified its own internal approval procedures, Brief for Appellants at 28, and the prior guidance and did not categorically preclude enforcement actions in sensitive or protected areas. *Id.* at 12.

Nor did Plaintiffs establish that the 2025 memoranda provide a basis to fear attending religious community activities among U.S.-citizen and lawful-immigrant congregants. ADD. 2, 23. An individual's subjective fears of encountering ICE do not mean that either ICE or the Department of Homeland Security, by enforcing their statutory obligations, are somehow deterring that individual from attending a religious service. These agencies cannot be held responsible for the subjective

fears of persons whom the agencies do not seek to detain. If the possibility of accidental arrests could be a basis for imminent harm, it could be used to show such harm in challenges to all immigration laws, and indeed all criminal laws, as well.

With respect to illegal aliens, as explained above, Plaintiffs cannot show that their absence from religious services will be caused by the 2025 memoranda rather than by the well-publicized increase in immigration law enforcement generally, and thus cannot show that the modification of internal agency procedures burdens their religious rights. Of course, vigorous immigration law enforcement generally, including perfectly effective enforcement, could not be successfully challenged under RFRA, because it would be the least restrictive means of serving the compelling governmental interest in achieving operational control of the border, defined by Congress as “the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband.” Secure Fence Act of 2006, Pub. L. 109-367, 120 Stat. 2638.; 42 U.S.C. § 2000bb-1(a), (b). Thus, to have a hope of prevailing, Plaintiffs must show at a minimum that the 2025 memoranda, not merely this vigorous enforcement generally, will cause the decreased attendance that they claim harms their religious rights. This they have not done.

Case: 26-1396 Document: 00118252 Page: 14 Date Filed: 08/03/2026 Entry ID: 6831450

## CONCLUSION

For the foregoing reasons, the decision below should be reversed.

Dated: August 3, 2026

Respectfully submitted,

/s/ Matt Crapo

Matt A. Crapo
Christopher J. Hajec
Edwin E. Pieters
Federation for American Immigration Reform
25 Massachusetts Ave., N.W., Ste. 330
Washington, D.C. 20001
(202) 328-7004
mcrapo@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the *amicus* brief in support of the motion contains 2,011 words. It also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Times New Roman typeface.

/s/ Matt Crapo

**CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2026, a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ Matt Crapo